RURAL AMERICAN BANK OF
GREENWALD, Appellant,

v.

Ben HERICKHOFF, Respondent,

Anna HERICKHOFF, et al., Defendants.

Ben Herickhoff, Respondent,

v.

Mark HERICKHOFF, Respondent.

No. CX–90–2341.

Supreme Court of Minnesota.

June 5, 1992.

Maclay R. Hyde, Laura Hein, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, for appellant.

Michael D. Miller, Cousineau, McGuire & Anderson, Chartered, Minneapolis, for Ben Herickhoff.

Scott B. Lundquist, Lundquist & Roth, Minneapolis, for Mark Herickhoff.

KEITH, Chief Justice.

This case involves the interpretation of Minnesota's credit agreement statute, Minn.Stat. § 513.33 (1990 & Supp.1991),[1] and its application to agriculture operational loans made to a retired farmer and his son and daughter-in-law.

Appellant, Rural American Bank of Greenwald (Bank), commenced this action against respondent, Ben Herickhoff, seeking to recover on a promissory note for $175,000, interest and attorney fees. Respondent asserted, as defenses, fraud and breach of the contractual provisions of the Loan Agreement underlying the note. Two weeks before trial, the Bank amended its complaint to assert, as a defense to respondent's breach of contract claim, the Minnesota credit agreement statute which requires credit agreements to be in writing and signed by the parties. Minn.Stat. § 513.33, subd. 2 (1990).

A jury trial was held and the jury, by special interrogatory, returned a verdict in favor of Ben Herickhoff finding that the Bank had breached the Loan Agreement underlying the Promissory Note. One month later, the court granted judgment in favor of the Bank finding that respondent was barred from asserting breach of contract as a defense because the Loan Agreement was signed only by Mark and Donna Herickhoff and not by the Bank and thus failed to meet the requirements of section 513.33, subd. 2.

---

1. The Minnesota credit agreement statute reads as follows:

**513.33.  Credit Agreements**

Subdivision 1. **Definitions.**  For the purposes of this section, the following terms have the meanings given them:

(1) "credit agreement" means an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation;

(2) "creditor" means a person who extends credit under a credit agreement with a debtor;

(3) "debtor" means a person who obtains credit or seeks a credit agreement with a creditor or who owes money to a creditor, and

(4) "signed" has the meaning specified in section 336.1–201(39).

Subd. 2.  **Credit agreements to be in writing.** A debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and debtor.

Subd. 3.  **Actions not considered agreements.**  (a) The following actions do not give rise to a claim that a new credit agreement is created, unless the agreement satisfies the requirements of subdivision 2:

(1) the rendering of financial advice by a creditor to a debtor;

(2) the consultation by a creditor with a debtor; or

(3) the agreement by a creditor to take certain actions, such as entering into a new credit agreement, forbearing from exercising remedies under prior credit agreements, or extending installments due under prior credit agreements.

(b) A credit agreement may not be implied from the relationship, fiduciary, or otherwise, of the creditor and the debtor.

Minn.Stat. § 513.33 (1990 & Supp.1991).

The Court of Appeals reversed the trial court's post-verdict judgment and ordered reinstatement of the jury verdict. *Rural American Bank v. Herickhoff,* 473 N.W.2d 361 (Minn.App.1991). The Bank petitioned for further review. We affirm.

## I.

Mark and Donna Herickhoff farm 2,300 acres in rural Minnesota. Some of their farm land was part of the Herickhoff family farm which had been farmed since the 1930s by Mark's parents, Ben Herickhoff and his wife, Anna, now in their eighties and retired. Mark and Donna's operation requires large amounts of cash yearly to purchase inputs to plant such acreage. In the spring of 1986 the Herickhoffs needed more cash than their bank, the State Bank of Greenwald (State Bank), could lend to them. A solution to the State Bank's lending limit was devised, whereby the State Bank agreed to lend $175,000 to Mark and Donna Herickhoff and, separately lend, $175,000 to Ben Herickhoff. The Herickhoffs had been one of the State Bank's largest farm customers for many years. Ben was initially hesitant to be involved in this loan, but agreed, on the condition that the proceeds from the sale of the crops be applied to first pay off his loan.

All of the documents related to these transactions were executed in the State Bank on May 1, 1986. Bernard Sunderman, then a loan officer and currently President of the Rural American Bank of Greenwald, Doug Winter, then Vice President, Ben and Mark Herickhoff met at the State Bank's board room to finalize the loans. Mark signed a promissory note for $175,000. Ben also signed a promissory note for $175,000. Security agreements and lines of credit were also signed by the parties.

A final document entitled "Loan Agreement for Mark and Donna Herickhoff" (Loan Agreement) was drafted and typed on the State Bank's letterhead by the State Bank's Vice President, Doug Winter. This Loan Agreement contained the arrangement regarding the priority repayment of Ben's loan. It was dated May 1, 1986 and

signed by both Mark and Donna. This document, which is at the heart of this action, states, in part:

> Mark and Donna Herickhoff ... agree to use the funds that are borrowed from Ben Herickhoff to be used for the sole purpose of the 1986 inputs for crops.... We agree that all income from crops ... shall be applied to the principal amount oweing (sic), First to the Loan of Ben Herickhoff.

Doug Winter testified that "according to the loan agreement that was signed, it was the understanding that Ben would have priority to Mark." The entire transaction was reviewed and approved by the State Bank's Loan Committee and all documentation, including the Loan Agreement, was placed in the Herickhoff loan file.

The 1986 crop yield was disastrous and the loans could not be repaid. Both Ben's and Mark's notes were renewed in December of 1986 and in July of 1987. No additional loan agreements were executed at either renewal date nor were any loan terms changed.

The 1987 crop yield was better and the Herickhoffs were able to apply over $233,-000 to the debt. Despite the priority repayment plan of the Loan Agreement, the proceeds from the sale of the crops were not applied to Ben's loan but rather were applied to pay off the entirety of Mark's loan. In response to the Herickhoff's questioning regarding the handling of the loans, Bernard Sunderman, the State Bank's Loan Officer, told the Herickhoffs that "the Bank comes first."

On October 2, 1987, the Commissioner of Commerce of the State of Minnesota determined that the State Bank of Greenwald was insolvent, closed it, took possession of its assets and appointed the FDIC as receiver. Deposit obligations and assets, including the Herickhoff loans, were transferred to the Rural American Bank of Greenwald. Bernard Sunderman became the president of the new bank.

Shortly thereafter, the Bank informed Ben that his loan was due and demanded payment in full. When he refused to pay, the Bank commenced suit against Ben.

The parties engaged in extensive discovery and numerous motions were made by both sides. Shortly before trial, the Bank brought a motion to amend its pleadings so that it could formally invoke the Minnesota credit agreement statute, Minn.Stat. § 513.33 (1990). The Bank's motion to amend was granted by the court two weeks before trial.

On the first day of the jury trial, the Bank brought a motion in limine seeking to prohibit introduction of the Loan Agreement and evidence of oral promises regarding the Loan Agreement. They also brought a motion for a directed verdict alleging that section 513.33, subdivision 2, barred Ben's defense. The court allowed the admission of the Loan Agreement and any related oral evidence and took the motion for a directed verdict under advisement.

The jury returned a special verdict for Ben Herickhoff finding, among other things, that the Bank had breached its contract with Ben, that Ben had not waived the breach, and that the Bank had not fraudulently induced Ben to enter into the loan. One month later, the court reversed the jury verdict. The court concluded that the Loan Agreement was a "financial accommodation" within the meaning of the credit agreement statute but that the signature of the Bank could not be inferred from the use of the letterhead stationery and therefore the signature requirement of the statute was not met.

The Herickhoffs appealed the trial court's ruling. The Court of Appeals reversed and reinstated the jury verdict upon their conclusion that the Loan Agreement signed by Mark and Donna Herickhoff was neither a credit agreement nor a financial accommodation within the meaning of section 513.33. *Rural American Bank of Greenwald v. Herickhoff,* 473 N.W.2d at 363.

During the pendency of the appeal, the Herickhoffs took their legal problem to their State Representative, Sylvester Uphus. Representative Uphus then introduced legislation in the Minnesota House which originally read: "A credit agreement need not be signed by the creditor if: (1) the creditor prepared the agreement on the creditor's letterhead stationery; and (2) the credit agreement does not contain a signature line for the creditor." H.F. 895, as read for the first time in the House, March 18, 1991. Mark and Donna Herickhoff, along with their attorney, testified in favor of the legislation. This language was subsequently amended to read: "'signed' has the meaning specified in section 336.1–201(39)." H.F. 895, read for the second time, April 24, 1991. The amended language was ultimately enacted into law and is codified at Minn.Stat. § 513.33, subd. 1(4) (Supp.1991).

## II.

The issue is whether the Minnesota credit agreement statute bars respondent from asserting breach of the contractual provisions of the Loan Agreement as a defense to the Bank's claim. To answer this question, we must decide whether the Loan Agreement is a "credit agreement" within the meaning of the credit agreement statute, and if so, whether it meets the signing requirements of subdivision 2 of the statute.

The Minnesota credit agreement statute was enacted in 1985 to protect lenders from having to litigate claims of oral promises to renew agricultural loans. *Becker v. First American State Bank of Redwood Falls,* 420 N.W.2d 239, 241 (Minn. App.1988) (the farm financing problems prompted the enactment of § 513.33); *Rural American Bank of Greenwald v. Herickhoff,* 473 N.W.2d at 363. The farm crisis of the 1980s produced cash-strapped and financially unsophisticated farmers who claimed reliance upon their bank officers' oral promises to renew their loans. Numerous lawsuits arose over the bankers' alleged oral promises. The credit agreement statute was passed to prevent the litigation of such difficult claims.

The statute defines a "credit agreement" as "an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to

make any other financial accommodation." Minn.Stat. § 513.33 subd. 1(1) (1990 & Supp.1991).

The Court of Appeals relied upon rules of statutory construction and concluded " 'any financial accommodation' must be interpreted to mean a financial accommodation in the nature of lending or forbearance agreement or some other agreement for extension of credit." *Rural American Bank of Greenwald v. Herickhoff,* 473 N.W.2d at 363. The Court of Appeals stated that the Loan Agreement itself was not a lending agreement, a forbearance agreement or an extension of credit and thus was not within the statute.

We believe such analysis does disservice to the spirit and purpose of the legislation. The Loan Agreement is precisely the kind of "financial accommodation" intended to be covered by the statute. The Loan Agreement is a financial accommodation with respect to a lending agreement. In the alternative, one could describe the Bank's promise to apply proceeds to Ben's loan first as an agreement to *forbear* repayment of Mark Herickhoff's loan. *See Pako Corp. v. Citytrust,* 109 B.R. 368, 377 (D.Minn.1989) ("[T]he broad language of the statute ... reaches not only agreements to 'lend or forbear repayment of money,' but also any other 'financial accommodation.' ")

We hold that the credit exchange between the Herickhoffs and the Rural American Bank of Greenwald falls squarely within the parameters of the legislature's concerns and that the Loan Agreement's priority repayment plan qualifies as a financial accommodation within the meaning of the credit agreement statute.

### III.

■ The linchpin issue becomes whether the Loan Agreement meets the requirements of subdivision 2 of the credit agreement statute which states that "[a] debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." Minn.Stat. § 513.33, subd. 2 (1990).

The Loan Agreement is in writing, expresses consideration, and, while neither gracefully drafted nor grammatically correct, does set forth the relevant terms and conditions. The key issue is whether or not the Loan Agreement is signed by the creditor and the debtor.

As originally enacted, section 513.33, did not define "signed." Subsequent to the Herickhoff's plea to the Legislature, the statute was amended. The new language was intended to "clarify the intent of the legislature in enacting section 513.33." 1991 Minn. Laws, ch. 329, sec. 2. The amended language states: " 'signed' has the meaning specified in section 336.1–201(39)." Minn.Stat. § 513.33 subd. 1(4) (Supp.1991). Section 336.1–201 is the general definition section of Minnesota's codification of the Uniform Commercial Code. It reads: " 'Signed' includes any symbol executed or adopted by a party with present intent to authenticate a writing." Minn.Stat. § 336.1–201(39) (1990). The Uniform Commercial Code Comment states:

> The inclusion of authentication in the definition of "signed" is to make clear that as the term is used in this Act a complete signature is not necessary. Authentication may be printed, stamped or written; it may be by initials or by thumbprint. It may be on any part of the document and in appropriate cases may be found in a billhead or letterhead. No catalog of possible authentications can be complete and the court must use common sense and commercial experience in passing upon these matters. The question always is whether the symbol was executed or adopted by the party with present intention to authenticate the writing.

Uniform Commercial Code, Comment. Minn.Stat.Ann. § 336.1–201.39 (1966).

■ Generally, a statute is not retroactive unless it is specifically stated by the legislature. *Chapman v. Davis,* 233 Minn. 62, 65, 45 N.W.2d 822, 824 (Minn.1951); Minn.Stat. § 645.21 (1990); Minn.Stat.

§ 645.31 (1990). While the 1991 amendment does not explicitly state that it is to be applied retroactively, it does say that its purpose is to clarify the intent of the legislature in enacting section 513.33. 1991 Minn. Laws, ch. 329, sec. 2. Clarifications are to be read into statutory laws retroactively. *Nardini v. Nardini*, 414 N.W.2d 184, 196 (Minn.1987).

This Loan Agreement was drafted and typed by an officer of the Bank on the Bank's letterhead stationery. The letterhead included the names of the Bank officers; two of whom were present at the May 1, 1986 loan execution. The Loan Agreement referred to other documents that were executed in conjunction with the Loan Agreement. Its terms were presented to the Loan Committee and were part of the Herickhoff loan file. If the Bank did not have the intent to authenticate the writing, they would not have drafted the Loan Agreement in the first place, would not have typed it on Bank letterhead, would not have presented it to the Loan Committee, nor retained it in the file. "Common sense and commercial experience" compel the conclusion that the Bank intended to be bound by the provisions of the Loan Agreement.

In *Barber–Greene Co. v. National City Bank of Minneapolis*, 816 F.2d 1267 (8th Cir.1987), the issue was whether, under Minnesota law, a security interest met the debtor signature requirement when it was signed, not by the debtor, but by Barber–Greene's manager. The jury was told that if they found that the debtor adopted the signing by the manager then the financing statement was valid. *Id.* at 1268. The Eighth Circuit upheld this instruction and stated that the Uniform Commercial Code does not require a written adoption. The court further wrote:

> Finally, we note that the instruction in the Official Comment to use common sense and commercial practice (sic) in passing on these matters indicates that the adoption issues should be resolved on a case-by-case basis. In this case, the financing statement was accurate in every respect, except for the debtor's signature. The statement served its intended purpose * * *.

*Id.* at 1271.

■ The basic purpose of the writing requirements is to "provide reasonable safeguards to insure honest dealing and [the statute of frauds] was not enacted to make a fetish of literal statutory compliance or a fetish of requiring a perfect written contract." *Greer v. Kooiker*, 312 Minn. 499, 505, 253 N.W.2d 133, 138 (1977), citing *Doyle v. Wohlrabe*, 243 Minn. 107, 110, 66 N.W.2d 757, 761 (1954). *See also Greyhound Lines, Inc. v. First State Bank of Rollingstone*, 366 N.W.2d 354, 357 (Minn.App.) *rev. denied* (1985) (preprinted name and logo on check sufficient signature); *Automotive Spares Corp. v. Archer Bearings Co.*, 382 F.Supp. 513, 515 (N.D.Ill.1974) (The sending of a document on the sender's letterhead is "more convincing [with respect to sender's intent to be bound by document] than the fact that the document does not contain a formal signature.").

■ The Bank argues that the document at issue is not the Loan Agreement executed on May 1, 1986, but rather, the renewal note signed by Ben Herickhoff in July of 1987. The renewal documents do not include any specific renewal of the priority repayment plans and therefore the Bank asserts that they did not breach any agreement. The renewal notes did not add, alter or remove any terms with respect to the priority repayment plan and were merely extensions of time for repayment. The renewal notes can not serve to cancel the obligations of the parties with respect to the Loan Agreement. *See Farmers Union Oil Co. v. Fladeland*, 287 Minn. 315, 319, 178 N.W.2d 254, 257 (1970) ("It is generally held that the mere execution of a renewal note evidences the same debt by a new promise and does not constitute payment or discharge of the original note but operates only as an extension of time for payment.").

■ The Bank further argues that because the Loan Agreement was not signed by Ben, but rather by Mark and Donna, that it does not satisfy the specific require-

ments of the statute that it be signed by the debtor and the creditor. The Loan Agreement was signed by Mark and Donna Herickhoff. Ben Herickhoff is an intended third-party beneficiary under the contract made between the Bank and Mark and Donna in the Loan Agreement and as such, acquires rights under the contract, including the right to assert breach of contract as a defense. *See Cretex Companies, Inc. v. Construction Leaders, Inc.*, 342 N.W.2d 135, 139 (Minn.1984).

Common sense and commercial experience lead us to conclude that the Loan Agreement, drafted by the Bank on its letterhead and executed in the presence of all the parties, meets the requirements of section 513.33, subdivision 2.

Because we hold that the Loan Agreement is a credit agreement within the meaning of the statute and that it meets the requirements of subdivision 2, we affirm the court of appeals decision reinstating the jury verdict in favor of Ben Herickhoff. In view of this decision, it is not necessary to consider the Bank's request for attorneys' fees or the parties' objections to certain procedural issues.

Affirmed.

SIMONETT, Justice (concurring specially).

I join in the court's opinion but wish to comment on a matter of statutory construction.

While this appeal was pending, the defendants Herickhoff had their state representative introduce legislation in the Minnesota House that apparently was designed to reverse the trial judge's adverse decision. *See* Legislative Tape, *House Commerce Committee*, April 10, 1991. The proposed bill provided that "A credit agreement need not be signed by the creditor if: (1) the creditor prepared the agreement on the creditor's letterhead stationery; and (2) the credit agreement does not contain a signature line for the creditor." *See* H.F. 895 as read for the first time in the House, March 18, 1991.[1] Mark and Donna Herickhoff along with their attorney testified before the House Committee on Financial Institutions and Insurance and the Senate Commerce Committee in support of the bill. The original proposal was amended and, ultimately, 1991 Minn.Laws, ch. 329 was passed, section 1 of which added a fourth subparagraph to Minn.Stat. § 513.33, subd. 1, as follows: "(4) 'signed' has the meaning specified in section 336.1–201(39)." Section 2 of the amendment reads: "The intent of section 1 is to clarify the intent of the legislature in enacting section 513.33."

As the law becomes increasingly statutory, we may expect more litigants to resort to the legislature to reverse an adverse judicial ruling; and to this I have no objection as personal initiative and ingenuity are not to be denied. My interest is in how this court should view "clarifying" legislation which, if applied retroactively, may reverse a court ruling.

Ordinarily a statute is not to be applied retroactively unless it specifically so states. Minn.Stat. §§ 645.21, 645.31 (1990); *Chapman v. Davis*, 233 Minn. 62, 64–65, 45 N.W.2d 822, 824 (1951). If, however, an amendment seeks only to "clarify" the interpretation of the statute, we have said the clarifying amendment may be applied retroactively. *Nardini v. Nardini*, 414 N.W.2d 184, 196 (Minn.1987). The rationale is that the legislature is not changing its mind but is only making clear the legislative intent that was always there. *Id.* See also *Holman v. All Nation Ins. Co.*, 288 N.W.2d 244, 250–51 (Minn.1980); *Gudvangen v. Austin Mut. Ins. Co.*, 284 N.W.2d 813, 817 (Minn.1978). The more doubt or ambiguity surrounding a statute, the more likely it is that an amendment of the statute is intended to clarify rather than to change the law. Sutherland, *Statutory Construction* § 49.11 (5th ed. 1992).

---

1. The original proposed amendment begins "A credit agreement need not be signed" if certain conditions are met, conditions which conveniently fit the facts of this lawsuit. What is interesting is that the bill assumes that "signed" means to affix one's written signature, and the bill then proceeds on the theory that the word "signed" has to be supplemented with a new definition, not just clarified.

When section 513.33 was enacted, requiring that credit agreements must be "signed" to be enforceable, the word "signed" was not defined. By passing what it designates as a "clarifying amendment," the legislature now is apparently saying that it had always intended "signed" to include the U.C.C. meaning of the term, namely, "any symbol executed or adopted by a party with present intention to authenticate a writing." *See* Minn.Stat. § 336.1–201(39) (1990).

This court now holds that the word "signed" as originally used in the statute includes the U.C.C. meaning. But does the court reach this result on its own or by giving full faith and credit to the clarifying amendment? If the latter, I would have a problem. A legislative clarification prompted by an influential constituent seeking to reverse a court ruling seems to me highly suspect. Particularly is this true here, where the defendants, when the case was in the trial court, were apparently unable to point to any legislative history in the original enactment suggesting that the legislature had the U.C.C. then in mind, and where the trial judge ruled that, as originally enacted, the word "signed" did not include the U.C.C. definition.

For the purpose of determining what the legislature meant by "signed" when the statute was enacted in 1985, I would give little, if any, weight to the "clarifying" label tacked onto the 1991 amendment. Even so, in this case, I would reach the same result as the majority opinion; I would do so, however, simply by analyzing the intent and purpose of the original statute.

In this case there is nothing about the original statute (nothing, for example, about its language or grammar) that shrouds the word "signed" in ambiguity or doubt. It is only after the word "signed" is considered within the factual context of this case that its latent ambiguity emerges. In resolving this ambiguity to arrive at legislative intent, Minn.Stat. § 645.16 lists various factors to be considered by the court, such as the occasion for the law, the mischief to be remedied, and what bearing other laws on a similar subject might have.[2] In considering these factors, I conclude that, when the legislature enacted § 513.33 in 1985, it intended "signed" to have a broad meaning, a meaning which one would expect bankers to be conversant with, the meaning given "signed" in the Uniform Commercial Code and which is consistent with commercial usage. In other words, putting completely aside the "clarifying" label, I have no difficulty concluding that "signed" as used in the original enactment, included the U.C.C. definition.

The question here is not whether the legislature can change the meaning of a statute by a subsequent amendment. Of course it can. The question, rather, is whether the legislature intends the change in meaning to be retroactive. For reasons of fairness, the legislature will usually be disinclined to give retroactive effect to the insertion of a new, unexpected meaning to an existing statute. *See* Smead, *The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence*, 20 Minn. L.Rev. 775 (1936). On the other hand, if the amended meaning or the need for an amended meaning was foreshadowed in the existing law, the legislature might be inclined to give the amended meaning retroactive effect and might even flatly so state. *See* Minn.Stat. § 645.21 (1990) ("No law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature."). But when the legislature chooses simply to characterize an amendment as "clarifying," the court should, it seems to me, carefully consider the basis for the characterization before attributing to it any retroactivity.

Any attempt to give retroactive effect to a "clarification" obtained through the sole

---

**2.** These factors include: "(1) The occasion and necessity for the law; (2) The circumstances under which it was enacted; (3) The mischief to be remedied; (4) The object to be obtained; (5) The former law, if any, including other laws upon the same or similar subjects; (6) The consequences of a particular interpretation; (7) The contemporaneous legislative history; and (8) Legislative and administrative interpretations of the statute." Minn.Stat. § 645.16 (1990).

initiative of a disappointed litigant seeking to reverse an adverse ruling in a still-pending lawsuit should be treated with great skepticism.

COYNE, Justice (concurring specially).

I join in the special concurrence of Justice Simonett.