**WHIRLPOOL FINANCIAL CORPORATION,**
Plaintiff,

v.

**Jean SEVAUX, Defendant.**

**No. 93 C 4725.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 24, 1994.

See also 866 F.Supp. 1102.

Richard Paul Glovka, David M. Simon, and W. Scott Nehs, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Whirlpool Financial Corp.

Alan Hugh Cooper, Conde, Stoner & Killoren, Rockford, IL, and Thomas E. Engel, James G. McCarney, and Michael I. Verde, Engel & McCarney, New York City, for Jean Sevaux.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Whirlpool Financial Corporation ("WFC") brought a complaint against defendant Jean Sevaux ("Sevaux") seeking damages for Sevaux's failure to pay on a note. Sevaux responded with six affirmative defenses and five counterclaims. Presently before this Court are WFC's motion to dismiss Sevaux's counterclaims and to strike his affirmative defenses. For the reasons set forth below, we deny the motion in its entirety.

### I. Factual Background

Sevaux's factual allegations, which we take as true for the purposes of this motion, *see, e.g., Balabanos v. North Am. Inv. Group, Ltd.,* 708 F.Supp. 1488, 1491 n. 1 (N.D.Ill. 1988), are as follows:

WFC is a Delaware corporation with a Michigan principal place of business. Sevaux is a French citizen and resident. WFC employed Sevaux to identify and refer investment opportunities to the company. During his tenure with WFC, Sevaux referred an investment opportunity in Raymond—a Venezuelan corporation wholly owned by Sevaux—to WFC.

In November 1991, WFC representatives met with Sevaux in Venezuela and orally agreed to buy a fifty percent equity interest in Raymond for seventeen million dollars. Because of cash flow problems at Raymond, WFC also agreed to advance one million dollars to Raymond if Sevaux would do the same.

On December 21, 1991, part of this agreement was reduced to writing: Sevaux executed and delivered a Term Loan Promissory Note ("the Note") to WFC for the sum of one million dollars. The Note secured *WFC's* one million dollar advance to Raymond. WFC assured Sevaux that the Note was an

interim measure, that he would not be required to make payment on it, and that the proceeds would be converted to a portion of WFC's equity investment in Raymond. Sevaux also personally advanced one million dollars to Raymond in anticipation of WFC's equity investment.

That investment never came. On July 28, 1992, after payment on the Note was first due, WFC told Sevaux that it would not fulfill its promise to invest in Raymond.

The Note itself provides that Sevaux was obligated to repay the principal on July 1, 1992. WFC extended the maturity date through Note Extension Agreements signed by both WFC and Sevaux, first to November 3, 1992, and later to June 30, 1993. Sevaux failed to pay on the June 30, 1993, maturity date.

Less than a week later, and on August 5, 1993, WFC filed this action for payment on the Note. In response, Sevaux pleaded six affirmative defenses—fraud in the inducement; fraud under 815 ILCS 105/10; estoppel by breach of fiduciary duty; constructive fraud, failure of consideration, and want of consideration under 815 ILCS 105/9. He also pleaded five counterclaims—fraud, breach of contract, promissory estoppel, breach of fiduciary duty and constructive fraud.

In short, Sevaux contends that WFC schemed to defraud him. Sevaux alleges that WFC falsely represented an intent to invest $17 million in Raymond, that in reliance on that promise Sevaux signed the $1 million Note and invested $1 million of his own cash into Raymond. WFC also falsely represented that Sevaux would never have to pay on the Note because WFC promised that the $17 million investment would extinguish Sevaux's obligation thereunder. Because of this scheme, Sevaux contends he forewent other financial options to his own and Raymond's financial detriment.

WFC has moved to dismiss under Fed. R.Civ.P. 12(b)(6) all of the counterclaims for failure to state a claim upon which relief can be granted. WFC also moves to strike under Fed.R.Civ.P. 12(d) all the affirmative defenses as legally insufficient.

## II. Argument

 Well-settled legal standards apply. A motion to dismiss will be granted only if it is clear that the non-moving party (Sevaux) "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Sevaux's counterclaim must allege facts that adequately set forth the essential elements of the causes of action. *See, e.g., Gray v. County of Dane,* 854 F.2d 179, 182 (7th Cir.1988). A 12(b)(6) motion to dismiss tests the sufficiency of the counterclaim and does not decide the merits of the case. *See, e.g., General Electric Capital Corp. v. Donogh Homes,* 1993 WL 524814 at *1, 1993 U.S.Dist. LEXIS 17690 at *3 (N.D.Ill.1993).

 The standard by which to determine the sufficiency of an affirmative defense echoes the foregoing. A motion to strike should be granted only where the defendant can prove no set of facts to support the affirmative defense. *See, e.g., Van Schouwen v. Connaught Corp.,* 782 F.Supp. 1240, 1245 (N.D.Ill.1991). As a general matter, motions to strike are appropriate only where the affirmative defense[s] in question are clearly insufficient as a matter of law. *See id.*

### A. WFC's Motion to Dismiss the Counterclaims and to Strike the Affirmative Defenses Pursuant to the Credit Agreements Act

WFC seeks dismissal of all the counterclaims and the striking of affirmative defenses under the Illinois Credit Agreements Act. 815 ILCS 160/1 *et seq.* (1993) (the "Act").

The Act has two relevant provisions. First, it specifies that debtors cannot maintain actions on "credit agreements" unless they are reduced to writing. *Id.* at 160/2. And second, it provides that debtors do not have claims, counterclaims, or defenses based on certain agreements unless those agreements are similarly written. *Id.* at 160/3. Precious little case law provides further insight into the Act's definitions and terms, since the statute was enacted only relatively recently in 1989. *See, e.g., Resolution Trust*

*Corp. v. Thompson,* 989 F.2d 942, 944 (7th Cir.1993).

Here, WFC seeks to dismiss Sevaux's counterclaims and affirmative defenses because they are based on alleged oral promises. WFC's effort fails, however, because Sevaux has not sued on a "credit agreement" within the meaning off the Act.

■ The Act defines "credit agreement" in relevant part as "an agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money...." 815 ILCS at 160/1(1). Here, Sevaux alleges that WFC breached its agreement to invest $17 million in Raymond. Accordingly, we find that the alleged oral agreement did not constitute lending money, extensions of credit, or forbearance of repayment within the meaning of the Act.

The issue is admittedly complicated by Sevaux's contention that the alleged investment, if performed, would operate simultaneously to extinguish Sevaux's obligation to pay on the Note. As a result, WFC argues that the agreement to invest essentially involved *forbearance* of the obligation to repay the Note.

We find this argument flawed in two ways. First, the alleged agreement to invest $17 million cannot fairly be characterized as an agreement to forbear paying the $1 million Note. At best, only a small portion of the investment agreement—the promise to convert the $1 million advance into equity (Am. Answer ¶ 23)—is an agreement to forbear repayment.

More fundamentally, the meaning of "forbear repayment of money" reasonably can be interpreted to exclude what Sevaux alleges here—the complete *elimination* of the con-

templated debt. (Am. Answer ¶ 23: "to extinguish any liability on the Note.") Blacks Law, for example, defines "forbearance" as an "[a]ct by which a creditor *waits for payment of debt* due him by debtor after it becomes due." Blacks Law Dictionary 644 (5th ed. 1979) (emphasis added). The statute does not include in the definition of credit agreement a promise to *forgive* or extinguish obligations; regarding repayment of money, it contemplates only their delay or forbearance.[1]

Second, Sevaux alleges that the agreement to invest $17 million occurred before the $1 million advance evidenced by the Note. In relevant part, Section Three of the Credit Agreements Act provides that defenses alleging "the agreement by a creditor to modify or amend an *existing* credit agreement or to otherwise take certain actions such as ... forbearing from exercising remedies in connection with an *existing* credit agreement" must be in writing. 815 ILCS 160/3 (emphasis added). As pleaded by Sevaux, there was no *existing* obligation that the oral agreement modified.

WFC creatively pursues an additional avenue by which to bring the alleged agreement to invest under the purview of the Act. Since Sevaux's original Answer and Counterclaim stated that WFC's $17 million investment in Raymond was to be evidenced, at least in part, by "debentures," WFC argues that the agreement to invest itself constituted an agreement to lend money or extend credit. However, Sevaux's Amended Answer and Counterclaim deletes any reference to debentures as part of what WFC was to receive for its $17 million investment. As such, WFC's theory cannot be a basis for dismissal of the Amended Answer.[2]

---

1. *General Electric Capital,* 1993 WL 524814, 1993 U.S.Dist. LEXIS 17690, by contrast, evaluated a factual scenario without the textually-described nuances—a series of allegations to which the Act plainly is addressed. In *GECC,* Judge Kocoras evaluated an allegation that "GECC reneged on an oral agreement to extend or modify" loans. *Id.* 1993 WL 524814 at *2, at *5. *Resolution Trust Corp. v. Thompson,* 989 F.2d 942 (7th Cir.1993), on the other hand, never directly addressed the question of whether an alleged oral agreement "to forgive the unpaid balance of the loan" qualified as an agreement

"to lend money or extend credit or delay or forbear repayment of money." 989 F.2d at 943. In *Thompson,* the sole question addressed in the Court's abbreviated opinion was whether or not the RTC, as receiver, stood in the bank's shoes for the purposes of invoking the Act's protections.

2. This is not to say, of course, that discovery might not demonstrate that debentures were, in fact, part of the investment agreement, and that the agreement may therefore be precluded by the Act. Neither part of that two-step analysis, how-

Since this Court concludes that the Act's definition of "credit agreement" does not include the alleged promise to invest, this Court need not evaluate whether the Act would otherwise operate to pre-empt Sevaux's promissory estoppel and tort claims, or his fraudulent inducement defense.

### B. WFC's Motion to Dismiss Certain Counterclaims and to Strike Certain Affirmative Defenses Pursuant to the Statute of Frauds

WFC submits the Illinois Commercial Code's requirement that a contract for the sale of securities must be in writing as a second basis upon which to dismiss Sevaux's breach of contract counterclaim and to strike Sevaux's want of consideration and 105/9 affirmative defenses. *See* 810 5/8–319.

The Illinois statute of frauds provides in relevant part that "a contract for the sale of securities is not enforceable by way of action or defense" unless (a) the contract is reduced to writing; (b) delivery or registration is effected; (c) the sale is confirmed in writing; or (d) the party against whom admission is sought admits the sale. *See id.*

The parties dispute whether the Illinois statute of frauds governs and whether either the part or full performance exceptions apply. We find that Sevaux's allegations bring his breach of contract counterclaim within the partial performance exception. As such, we need not—and do not—address the remaining issues.

The partial performance exception applies where a party "has performed in reliance on the other party's promises or conduct [citation omitted], and where it is impossible to restore the parties to their original position." *Dresser Indus. Inc., v. Pyrrhus AG,* 936 F.2d 921, 929 (7th Cir. 1991). Here, Sevaux alleges that he executed the $1 million Note and advanced personal funds to Raymond in reliance on WFC's separate promise to invest $17 million. (Am. Answer ¶ 25, 39–40.) Sevaux further alleges that, by the time WFC finally advised that it

was repudiating the agreement to invest, Raymond's situation had deteriorated to the point that alternative financing was no longer available. (Am. Answer ¶ 29, 33.)

The dispute here centers on whether Sevaux's alleged reliance was so unjustifiable that "the law may properly say that this loss is his own responsibility." *Teamsters Local 282 Pension Trust Fund v. Angelos,* 839 F.2d 366, 371 (7th Cir.1988), *quoting Chicago Title and Trust Company v. First Arlington National Bank,* 118 Ill.App.3d 401, 73 Ill. Dec. 626, 632, 454 N.E.2d 723, 729 (1983). "[J]ustifiable reliance" exists on a specific representation "[o]nly where the parties do not have equal knowledge, or access thereto, or where there are other peculiar circumstances inducing the injured party to rely solely on the representation of the other." *Dresser,* 936 F.2d at 929. *See also Luciani v. Bestor,* 106 Ill.App.3d 878, 62 Ill.Dec. 501, 436 N.E.2d 251 (3 Dist.1982).

Invoking *Runnemede Owners, Inc. v. Crest Mortgage Corp.,* 861 F.2d 1053 (7th Cir.1988), WFC contends that, as an experienced businessman, Sevaux could not have justifiably relied on a promise that was directly contrary to the Note's unambiguous terms. The scenario here, however, differs dramatically from *Runnemede* and cases like it. Oral assurances that "we have a deal" were found in *Runnemede* to be inconsistent with the document that reduced the agreement to writing—"[t]his commitment letter is subject to the Loan Committee's approval in form and content." *Id.* at 1055. Similarly, in *Dresser,* the degree to which the oral representations reasonably could be relied on was substantially influenced by the following provision in the written agreement at issue: "We wish to discuss a new form of relationship subsequent to termination on August 1, 1988. . . . Such discussions are not intended and do not limit this termination notice." 936 F.2d at 929. *See generally Turner v. Johnson and Johnson,* 809 F.2d 90, 96 (1st Cir.1986) ("a contractual provision flatly contradictory to prior oral assurances should cause most people—and particularly experi-

---

ever, is for the Court to reach today. Indeed, the second step seems further complicated by the fact that the original answer also alleged that

preferred shares, in addition to debentures, were to be provided in exchange for the $17 million investment. Answer ¶ 23.

enced, knowledgeable businesspeople—to pause.").

We, therefore, find WFC's characterization of the issue to be misleading. The Note contains no provision warning Sevaux not to rely on oral representations varying the agreement's terms. Nor is the Note flatly inconsistent with the promise to invest.

The question instead is whether Sevaux's reliance on the alleged oral promise to invest $17 million was rendered *per se* unjustifiable because a portion of that agreement—the promise to extinguish the $1 million debt—was arguably contrary to the Note's separate terms and conditions. In short, we cannot conclude based on the pleadings that it was.

Sevaux alleges that he invested his own money in reliance on WFC's promise to invest. That reliance is not rendered as a matter of law unjustifiable because the Note, which secured a separate and distinct $1 million obligation, specified payment on a date certain and did not make reference to the alleged agreement to invest—the performance of which would have extinguished the Note's obligation. This Court is not prepared to rule that Sevaux's reliance on the separate agreement to invest $17 million is rendered unreasonable by the terms of the $1 million Note. To conclude otherwise would risk effecting a "fraud" on Sevaux. *See, e.g., Payne v. Mill Race Inn*, 152 Ill. App.3d 269, 278, 105 Ill.Dec. 324, 331, 504 N.E.2d 193, 200 (2 Dist.1987) ("Plaintiff's allegations are sufficient to show that the detriment she has suffered by beginning to perform her contractual obligations is such that to bar the instant action would be a virtual fraud upon her").[3]

Further, "[i]n determining whether a party justifiably relies on another's representations, *all of the circumstances surrounding the transactions* ... will be taken into consideration." *Luciani*, 106 Ill.App.3d at 884, 62 Ill.Dec. at 506, 436 N.E.2d at 256 (emphasis added). Sevaux has *pleaded* allegations sufficient to bring his breach of contract counterclaim within the part performance ex-

ception to the statute of frauds. Discovery will reveal the degree to which "all of the circumstances surrounding the transactions" evidence justifiable reliance. For now, it is sufficient to note that the agreement to invest was distinct and that Sevaux alleges that he and WFC stood as fiduciaries to one another. (Am. Answer ¶¶ 21, 61.)

### III. Conclusion

For the reasons set forth above, WFC's motion to dismiss and to strike is denied. It is so ordered.

---

**3.** The Act's "or in any way related to" language is not to the contrary. In context, the relevant provision states that a "debtor may not maintain an action on or in any way related to a credit

agreement unless the credit agreement is in writing...." 815 ILCS 160/2. The credit agreement here is the $1 million obligation, which is already evidenced by the Note.