**WHIRLPOOL FINANCIAL CORPORATION, Plaintiff-Counterdefendant,**

v.

**Jean SEVAUX, Defendant-Counterclaimant.**

**No. 93 C 4725.**

United States District Court, N.D. Illinois, Eastern Division.

Dec. 28, 1994.

---

Richard Paul Glovka, David M. Simon, W. Scott Nehs, Wildman, Harrold, Allen & Dixon, Chicago, IL, for plaintiff.

Alan Hugh Cooper, Conde, Stoner & Killoren, Rockford, IL, Thomas E. Engel, James G. McCarney, Michael I. Verde, Engel & McCarney, New York City, for Jean Sevaux.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Whirlpool Financial Corporation ("WFC") brings this one count complaint against Jean Sevaux, alleging that he has failed to repay a $1 million note owed to WFC. In response to WFC's complaint, de-

fendant Sevaux raises six affirmative defenses and five counterclaims. Presently before this court is plaintiff's motion for summary judgment on all of Sevaux's counterclaims and affirmative defenses. For the reasons set forth below, plaintiff's motion is granted.

## 1. Background [1]

Sevaux is a resident of France and the United Kingdom who has been involved in banking and finance since at least 1962. WFC is a Delaware corporation that provides debt and equity's financing to business entities. Sevaux's relationship with WFC began in 1990, when he and his investment firm were contracted to identify and refer investment opportunities to WFC.

In addition to his consulting business, Sevaux was sole owner and president of Raymond de Venezuela ("Raymond"), a Venezuelan manufacturer of concrete pilings and platforms used in offshore oil rigs. Sometime in 1991, Sevaux discovered that Raymond was in dire need of cash and required between $4 million and $5 million in order to continue its operations. Sevaux contacted Rich Palmieri, president of WFC, in late 1991 and discussed the possibility of obtaining financing for Raymond. On November 24–26, 1991, Palmieri and Joel Webber, a WFC vice-president, met with Sevaux at Raymond's offices in Venezuela. At this meeting, the parties discussed not only a short-term infusion of cash, but also a long-term refinancing of Raymond's approximately $13 million in Venezuelan debt obligations.

In order to increase the tax advantages for WFC, the parties considered structuring the deal to involve the sale of preferred stock in Raymond to WFC. The parties also discussed which of Raymond's parent holding companies would actually be the borrowing entity. Sevaux stated in his deposition that at one point during these negotiations Palmieri took him aside and said, "for the package of $17.5 million, I want fifty percent of the company...." Sevaux Dep., at 162.[2] Sevaux claims that he responded by saying "that's a deal" and shook hands with Palmieri.

Although the terms and conditions of the $17.5 million package of financing were not agreed upon,[3] Sevaux claims that at the close of the meetings WFC agreed to advance $1 million to Raymond if Sevaux would advance $1 million of his own funds to the company. In December 1991, Sevaux spoke with Webber and Michael Schmeer, WFC's attorney, and discussed the execution of a Term Loan Promissory Note ("Note") by Sevaux in order to secure the $1 million to be advanced by WFC.[4] WFC sent to Sevaux a copy of the six-page Note, which personally obligated Sevaux to repay the principal and interest on the $1 million loan,[5] to Sevaux in December 1991. In pertinent part, the Note (1) contained a blank for indicating the applicable interest rate, (2) stated that the outstanding balance of the loan would be repaid on or before July 1, 1992, and (3) warranted that

1. This discussion is gleaned from the parties' 12(M) and 12(N) statements submitted pursuant to the General Orders of the United States District Court for the Northern District of Illinois, as well as from the accompanying depositions and affidavits. Obviously, this discussion of the facts differs from that presented in our previous orders, since those motions were decided solely on the basis of the allegations in Sevaux's complaint.

2. WFC and Palmieri disavow any such conversation. Palmieri Dep., at 41.

3. "What we did not have is a—is how the package would be distributed between straight debt, equity, quasi equity because it had to be, it had to be resolved between the lawyers, with the tax people and so on and so on." Sevaux Dep., at 163.

4. Sevaux alleges that WFC assured him the Note was an interim measure, that he would not be

required to make payment on it, and that the proceeds would be converted to a portion of WFC's equity investment in Raymond.

5. When discussing his personal liability on the Note in his deposition, Sevaux gave the following responses:

Q: Did you understand when you were talking with Mr. Webber, that the note that was coming to you would be your personal obligation?
A: Interim obligation. Personal interim obligation.
....
Q: Was it your understanding that this note was your personal obligation to repay Whirlpool Financial Corporation $1 million.
A: It was.
Sevaux Dep., at 339, 346.

184

Sevaux was agreeing to the Note as part of a commercial loan transaction. Note ¶¶ 1.1, 2, 8. Sevaux filled in the applicable interest rate, signed and dated the Note on or about December 20, 1991, and returned it to WFC. He then instructed WFC to wire the $1 million to Raymond.

Sevaux alleges that on July 28, 1992, WFC informed him that it would not be investing or lending any further monies to Raymond. Although payment on the Note was originally due July 1, 1992, the parties agreed to extend the time for repayment to November 30, 1992, and later to June 30, 1993. Sevaux failed to repay the Note on the June 30 maturity date.

On August 5, 1993, WFC filed this action for payment on the Note, and Sevaux has filed an Amended Answer and Counterclaims against WFC, wherein Sevaux pleads: (1) fraud in the inducement, (2) fraud under 815 ILCS 105/10, (3) estoppel by breach of fiduciary duty, (4) constructive fraud, (5) failure of consideration, and (6) want of consideration under 815 ILCS 105/9. He also raises five counterclaims: (1) fraud, (2) breach of contract, (3) promissory estoppel, (4) breach of fiduciary duty and (5) constructive fraud. Essentially, Sevaux alleges that WFC falsely represented an intent to invest $17 million in Raymond, and that in reliance on that promise Sevaux signed the $1 million Note and invested $1 million of his own money into Raymond. WFC is also alleged to have falsely represented that Sevaux would never have to pay on the Note and falsely promised that the $17 million investment would extinguish Sevaux's obligation thereunder. Sevaux asserts that because of WFC's scheme he forewent other financial options to his own and Raymond's financial detriment. Although we denied WFC's motion to dismiss Sevaux's counterclaims and affirmative defenses in our August 24, 1994 opinion, *Whirlpool Financial Corp. v. Sevaux*, 866 F.Supp. 1097 (N.D.Ill.1994) (*Sevaux I*), WFC now moves for summary judgment on the same issue.

**II. Summary Judgment Standard**

Summary judgment is appropriate if "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Once the moving party has met this burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c); *see Maxwell v. City of Indianapolis*, 998 F.2d 431, 433 (7th Cir.1993). In deciding a motion for summary judgment, the facts must be read in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). However, "[s]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment." *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

**III. Discussion**

■ WFC raises two arguments in support of its assertion that it is entitled to summary judgment on Sevaux's counterclaims and affirmative defenses. First, it claims that the Illinois Credit Agreements Act ("the Act") applies, and that counterclaims and defenses based on unwritten credit agreements, such as the agreement alleged by Sevaux, are therefore precluded. Second, WFC contends that the lack of any agreement between the parties, WFC's failure to make any false statements to Sevaux, the absence of a fiduciary relationship between the parties, and delivery of $1 million to Raymond as per Sevaux's instructions prevents Sevaux from maintaining any of his counterclaims or defenses. Because we agree with WFC's first argument as to applicability and effect of the Act on the alleged agreement between Sevaux and WFC,[6] we

6. The parties do not dispute that Illinois law controls this case.

need not address WFC's remaining arguments.

■ The Act imposes special writing requirements on claims stemming from any type of "credit agreement," [7] which is defined as an "agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money not primarily for personal, family or household purposes, and not in connection with the issuance of credit cards." 815 ILCS 160/1(1). In particular, the Act prohibits a debtor from "maintain[ing] an action on or in any way related to a credit agreement unless the credit agreement is in writing, expresses an agreement or commitment to lend money or extend credit or delay or forbear repayment of money, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." 815 ILCS 160/2. Moreover, a debtor cannot raise a claim, counterclaim or defense based on an allegation that there was an "agreement by a creditor to modify or amend an existing credit agreement or to otherwise take certain actions, such as entering into a new credit agreement, forbearing from exercising remedies in connection with an existing credit agreement, or rescheduling or extending installments due under an existing credit agreement," unless the writing requirements of the Act are satisfied. 815 ILCS 160/3. In other words, the Act imposes a stringent version of the Statute of Frauds—since it requires the signatures of both creditor and debtor on the agreement—on loans and credit advanced by financial institutions. *Resolution Trust Corp. v. Thompson*, 989 F.2d 942, 944 (7th Cir.1993).

WFC argues that Sevaux's counterclaims and defenses are all based on the alleged oral agreement to undertake $17.5 million of Raymond's financing. Since this purported understanding was not embodied in a signed writing, WFC contends that Sevaux's counterclaims and defenses are barred by the Act. Essentially, this is the same argument raised in WFC's motion to dismiss which we denied on August 24, 1994. However, at that time we were required to accept Sevaux's complaint as true, and we held that because he alleged the breach of an agreement to *invest* $17.5 million, as opposed to an agreement to *lend* $17.5 million, the Act did not apply. *Sevaux I*, 866 F.Supp. at 1099. We specifically reserved judgment on the question of whether, if discovery revealed facts indicating that credit was involved in the refinancing package, the Act would preclude Sevaux's counterclaims and defenses. *Id.* at 1100 n. 2. We now must reach this issue and decide whether (1) there is no genuine issue as to the existence of debt in the $17.5 million package of financing between WFC and Sevaux, and (2) whether the existence of debt in the refinancing brings Sevaux's counterclaims and defenses into the ambit of the Act.

WFC points to Sevaux's deposition as primary support for its assertion that at least some of the $17.5 million package involved the extension of credit to Raymond and Sevaux. When describing the meetings he had with WFC representatives in Venezuela on November 24–26, 1991, Sevaux stated that he originally intended to secure a $4–5 million loan. Sevaux Dep. at 159–60. He claimed that Palmieri then suggested a complete refinancing of the company, and he summed up Palmieri's statement as:

> We're going to replace, first we are going to lend you $4.5 million for the needs which I've just described and then, for your long term, for your term debt, we are going to replace your Venezuelan borrowings by a $13 million financing made by us.

Sevaux Dep. at 161. The parties next discussed what form the refinancing would take—for example, whether part of it would include a sale of preferred stock—and which holding companies would borrow from (or sell stock to) WFC. Sevaux Dep., at 161–62. Sevaux then claims that Palmieri took him aside and told him that in order to get the package of $17.5 million, WFC would have to get fifty percent of Raymond. Sevaux Dep., at 162. Sevaux did not state in his deposition

---

7. The Act covers all those engaged in the business of lending money or extending credit, as well as anyone "who obtains credit or seeks a credit agreement or claims the existence of a credit agreement with a creditor or who owes money to a creditor." 815 ILCS 160/1(2)–160/1(3).

that the parties then agreed that the "package" of $17.5 million would consist wholly of equity, as opposed to the part-debt/part-equity package which was under consideration. Nor does Sevaux contend in his deposition that he understood the agreement to have been transformed into one involving only an equity position for WFC. Indeed, Sevaux claims that the parties did not finalize what form the package would take,[8] and he described the agreement in the following terms:

> I think the $13 million would be, the idea that it would be debt to replace the debt and the 4.5 was more or less equity, but there, again, nothing was decided....

Sevaux Dep., at 201.[9] In short, nothing in Sevaux's deposition testimony supports his allegation that the entire $17.5 million at issue would constitute the sale price of fifty percent of Raymond.[10] Rather, Sevaux's testimony supports the contention that while some of the package would include an equity infusion in Raymond, part of the money extended by WFC would be in the form of a loan.[11]

■ Sevaux tries to overcome the deficiencies in his deposition testimony by submitting an affidavit along with his brief in opposition to the instant motion. In this declaration Sevaux claims that with regard to the oral understanding reached by the parties, "[a]ll the material terms had been agreed upon. WFC would advance $17.5 million to the company in exchange for a fifty percent equity interest and a preferred return at the prime rate plus two percent." Sevaux Declaration ¶8. To be sure, if this were the only evidence available on the issue, summary judgment would be inappropriate. But this is not the only evidence, and to the extent this affidavit is inconsistent with Sevaux's deposition testimony, it is clear that such a declaration cannot defeat a motion for summary judgment. *See Darnell v. Target Stores*, 16 F.3d 174, 177 (7th Cir.1994) (party cannot "create issues of fact" with affidavits which are contradicted by affiants' depositions); *Slowiak v. Land O'Lakes, Inc*, 987 F.2d 1293, 1296–97 (7th Cir.1993) (contradictory, self-serving affidavit cannot create genuine issue of material fact).[12]

In sum, no evidence exists to support Sevaux's assertion that the alleged oral agreement contained only an equity component. To be sure, we must view the facts in a light most favorable to Sevaux; however, there are simply no facts in the record which could support Sevaux's position. Indeed, Sevaux's own testimony supports the contention that at least part of the package included debt financing, and was therefore a "credit agreement" covered by the Act.

■ Sevaux attempts to escape the reach of the Act by claiming that because he personally secured the $1 million loan from WFC, it was for his personal use and there-

---

8. Q: Just to make sure I understand. I take it, when you say that the form was still a topic to be decided, had it been pinned down that there was going to be a preferred stock method of investment?
   A: No. The idea was discussed but nothing had been decided. Sevaux Dep., at 201.

9. Sevaux's claim that "nothing was decided" undermines his assertion that the parties even had an agreement. Nonetheless, we will assume for purposes of this motion that some agreement was reached between the parties at these meetings.

10. In fact, Sevaux admitted in his deposition that $17.5 million was not the purchase price for fifty percent of Raymond. Sevaux Dep., at 487.

11. Indeed, in his deposition Sevaux stated that it did not matter how the deal was structured so long as Raymond received the necessary funding. Sevaux Dep., at 202.

12. Moreover, Sevaux's affidavit does not directly attack WFC's assertion that at least part of the deal involved a loan, since Sevaux claims to have agreed to give WFC an equity position *and* a preferred rate of return. Sevaux Declaration ¶8. This statement suggests that regardless of the performance of Raymond's stock, Sevaux guaranteed that WFC's investment would generate at least a certain amount of income—in other words, that WFC would receive a guaranteed rate of return on its "loan."

Finally, Sevaux contends in his brief that "the parties envisioned that the investment would take the form of preferred stock rather than debt...." Sevaux Brief, at 3. However, the portion of his affidavit that he cites for support of this contention does not help him, but rather, strengthens WFC's assertion that at least part of the $17.5 million package included debt. Moreover, to the extent this portion of his affidavit contradicts his deposition testimony, it suffers from the same defect as his other self-serving statements.

fore falls outside the scope of the Act. This argument fails for two reasons. First, regardless of whether the $1 million Note on which WFC is suing is characterized as "personal" or "business," Sevaux's counterclaims and defenses are based on a second alleged agreement—that is, the agreement by WFC to provide $17.5 million in financing to Raymond. Thus, the fact that the $1 million Note was entered into for personal purposes would have no bearing on the preclusive effect of the Act on Sevaux's counterclaims and defenses. Second, Sevaux misreads the statute as exempting those loans which are secured by a personal guarantee, whereas it only exempts agreements to loan money "primarily for personal, family or household purposes...." 815 ILCS 160/1(1). In addition to the explicit language of the Note, which states that the loan is intended for commercial purposes, Sevaux himself admits that the loan was used to shore up Raymond's precarious financial position. Clearly, this credit agreement was not entered into for personal purposes. However, because the alleged oral compact is the credit agreement at issue, and not the $1 million Note, we must examine that agreement and its relation to Sevaux's counterclaims and defenses to determine the preclusive effect of the Act.

We first address the impact of the Act on Sevaux's counterclaims. "The Act expressly precludes actions 'in any way related to' a credit agreement unless the agreement is in writing and signed by the parties." *General Electric Capital Corp. v. Donogh Homes, Inc.*, No. 93 C 5614, 1993 WL 524814, at *3 (N.D.Ill. December 15, 1993) ("*GECC*"). The fact that an action is grounded in something other than contract law does not change the applicability of the Act. *See GECC*, 1993 WL 524814, at *3–4 (dismissing counterclaims of negligent misrepresentation and intentional misrepresentation, in addition to counterclaims grounded in contract). Indeed, in the language of the Illinois courts, "[t]here is no limitation as to the type of actions by a debtor which are barred by the Act, so long as the action is in any way related to a credit agreement." *First National Bank in Staunton v.*

*McBride Chevrolet, Inc.*, 267 Ill.App.3d 367, 204 Ill.Dec. 676, 679, 642 N.E.2d 138, 142 (1994).[13] In the instant case, Sevaux's counterclaims are "related to" the alleged oral credit agreement between the parties. He contends in his fraud counterclaim that Palmieri falsely represented to him that WFC would provide $17.5 million in financing to Raymond and that Sevaux would not be required to repay the $1 million Note. Yet this "agreement" was never written down. His breach of contract and promissory estoppel claims rely on that same oral "agreement"— that is, that WFC would provide an entire package of $17.5 million to Raymond and that this funding would supersede the interim obligation contained in the Note. Finally, his breach of fiduciary duty and constructive fraud counts are also based on his allegation that he and Palmieri had an oral agreement concerning the refinancing of Raymond. All of these counterclaims arise out of an agreement to loan money which was not reduced to writing and signed by the parties, and as such they are barred by the Act. *First National Bank in Staunton*, 642 N.E.2d at 142 ("[A]ll actions which depend for their existence upon an oral credit agreement are barred by the Act."). Accordingly, WFC's motion is granted with respect to Sevaux's counterclaims.

The Act also prevents any "agreement by a creditor to modify or amend an existing credit agreement or to otherwise take certain actions, such as entering into a new credit agreement," from giving rise to a defense, unless the agreement satisfies the requirements of the Act. 815 ILCS 160/3. As alleged by Sevaux in his complaint and deposition, the agreement to extend $17.5 million was reached before the $1 million Note was executed, and therefore his affirmative defenses are not based on an oral modification or amendment of "an existing credit agreement." However, according to Sevaux WFC agreed not to hold him liable on the $1 million Note, but promised to convert the $1 million debt into an equity position. As discussed above, the evidence indicates that at least some of the $17.5 million package promised by WFC would

---

13. Although at the time of issuance of this ruling WESTLAW reports that this opinion has not yet been released for publication, the Appellate Court of Illinois for the Fourth District informs us that the opinion was released on November 28, 1994.

contain a debt component. In other words, WFC promised to "enter[ ] into a new credit agreement" with Sevaux—one which would replace the $1 million financing and supply the remaining $16.5 million in promised funds. Defenses based on oral agreements such as this are barred by the Act, 815 ILCS 160/3, regardless of whether they arise out of contract or tort law. *See First National Bank in Staunton*, 642 N.E.2d at 141–42 (affirming the dismissal of defenses based on an oral credit agreement); *GECC*, 1993 WL 524814, at *5–7 (same).[14] Accordingly, WFC's motion must be granted with respect to Sevaux's affirmative defenses.

### IV. Conclusion

For the reasons set forth above, plaintiff WFC's motion for summary judgment as to defendant Sevaux's counterclaims and defenses is granted. It is so ordered.

**14.** We note that in *Federal Deposit Insurance Corp. v. Bruno*, 777 F.Supp. 1432, 1437 (N.D.Ill. 1991), we declined to interpret the Act as barring a defense of fraudulent inducement based on an oral agreement. However, the plaintiff in *Bruno* provided only a "cursory argument" as to the preclusive force of the Act, *id.*, and we were called upon to strike the defense in the early phases of litigation. Moreover, *Bruno* was decided without the benefit of the recent application of the Act in *First National Bank of Staunton v. McBride Chevrolet*, 267 Ill.App.3d 367, 204 Ill. Dec. 676, 642 N.E.2d 138 (1994). Given the difference in the posture of the instant motion, as well as subsequent case law interpreting the Act, we do not read *Bruno* as requiring us to deny WFC's motion.