## WHIRLPOOL FINANCIAL CORPORATION, a Delaware Corporation, Plaintiff–Appellee,

v.

## Jean SEVAUX, Defendant–Appellant.

### No. 95–3934.

United States Court of Appeals, Seventh Circuit.

Argued April 18, 1996.

Decided Sept. 10, 1996.

Richard P. Glovka (argued), David M. Simon, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Plaintiff–Appellee.

William P. O'Keefe, Jr., Chicago, IL, Thomas E. Engel (argued), James G. McCarney, Engel & McCarney, New York City, for Defendant–Appellant.

Before CUDAHY, RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

Jean Sevaux, the owner of a Venezuelan corporation with severe corporate cash flow difficulties, approached the Whirlpool Financial Corporation ("WFC"). The parties discussed a $17.5 million investment in the corporation by WFC, but nothing was decided definitively with respect to the form that the investment would take. Mr. Sevaux executed a $1 million note to secure WFC's initial $1 million investment. WFC made no further investment in Mr. Sevaux's corporation. Mr. Sevaux defaulted on the note, and WFC

commenced this action to secure payment. Mr. Sevaux raised a number of affirmative defenses and asserted a number of counterclaims. Each was predicated on WFC's oral promise to invest in the corporation and WFC's oral assurance that Mr. Sevaux's obligations under the note would be extinguished by WFC's investment. The district court concluded that Mr. Sevaux's affirmative defenses are barred by the Illinois Credit Agreements Act and entered summary judgment in favor of WFC. Mr. Sevaux now appeals the entry of summary judgment against him on his affirmative defenses and counterclaims. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

Jean Sevaux is the president and sole owner of Raymond de Venezuela ("Raymond"), a corporation organized under the laws of Venezuela.[1] Raymond manufactures concrete pilings and platforms in Venezuela for the Venezuelan oil industry. In 1991, when Raymond was about to go public, Mr. Sevaux discovered that the corporation was experiencing severe cash flow difficulties. Needing a cash infusion to keep Raymond operating, Mr. Sevaux approached Richard Palmieri, WFC's president, and invited him to visit Raymond's facilities in Maracaibo, Venezuela.[2]

In November 1991, Palmieri and Joel Webber, a WFC vice-president, met with Mr. Sevaux at Raymond's offices in Venezuela. At this meeting, the parties discussed not only a short-term infusion of cash, but also a long-term refinancing of Raymond's approximately $13 million in Venezuelan debt obligations. Raymond's Venezuelan counsel pointed out the advantage under Venezuelan law of structuring WFC's investment as preferred stock, rather than debt, to avoid Vene-

zuelan tax on interest payments to foreign entities. The parties also considered which of Raymond's parent holding companies actually would be the borrowing entity. No agreement was reached, however, as to how the package would be distributed between straight debt, equity and quasi equity. Mr. Sevaux later testified that, at one point during the November 1991 meetings, Palmieri took him aside and said "for the package of $17.5 million, I want fifty percent of the company...." R. 167, Ex. A, Deposition of Jean Sevaux, at 162. Mr. Sevaux responded by saying "that's a deal" and shook hands with Palmieri. *Id.*

Pending completion of due diligence and selection of the proper vehicle for the $17.5 million investment, the parties agreed that Mr. Sevaux and WFC each would advance $1 million in new money to Raymond to sustain it on a short-term basis. WFC asked Mr. Sevaux to execute a $1 million promissory note to secure the $1 million to be advanced by WFC to Raymond. According to Mr. Sevaux, he was assured that this note was an "interim" measure, that he would not be required to make payment on the note, and that his liability on the note would be extinguished upon WFC's agreed-upon investment in Raymond. The note, which contained a blank for indicating the appropriate interest rate, stated that the outstanding balance of the loan would be repaid on or before July 1, 1992 and warranted that Mr. Sevaux was agreeing to the note as part of a commercial loan transaction. Mr. Sevaux inserted the interest rate specified by Palmieri and executed the note. Per Mr. Sevaux's instructions, WFC transferred the proceeds of the note to Raymond. Mr. Sevaux also transferred $1 million of his own money to Raymond.

On July 28, 1992, WFC informed Mr. Sevaux that it would not be investing in Raymond or lending any further monies to the

---

1. Mr. Sevaux owns Raymond through a series of corporate parents organized under the laws of Aruba, Curacao and Venezuela.

2. Mr. Sevaux's relationship with WFC began in 1990 when another of his companies, Rustbourne Associates, Ltd., was put on retainer by WFC to identify and refer international invest-

ment opportunities to WFC. Furthermore, Mr. Sevaux was well acquainted with WFC's chairman James LeBlanc and president Rich Palmieri; the three men had worked together on several projects when LeBlanc and Palmieri were employed by another financing company.

company. WFC extended the note's maturity date through "Note Extension Agreements," signed both by WFC and by Sevaux, first to November 3, 1992, and then to June 30, 1993. When Mr. Sevaux failed to repay the note on the June 30 maturity date, WFC commenced this action to recover payment on the note. Mr. Sevaux pleaded six affirmative defenses: (1) fraud in the inducement; (2) fraud under 815 ILCS 105/10; (3) estoppel by breach of fiduciary duty; (4) constructive fraud; (5) failure of consideration; and (6) want of consideration under 815 ILCS 105/9. He also responded with five counterclaims against WFC: (1) fraud; (2) breach of contract; (3) promissory estoppel; (4) breach of fiduciary duty; and (5) constructive fraud. In essence, Mr. Sevaux submits that WFC falsely represented an intent to invest $17.5 million in Raymond and that, in reliance on that promise, he executed the note and invested $1 million of his own money in Raymond. Mr. Sevaux further submits that WFC falsely represented that he would never have to repay the note and that WFC's anticipated investment would extinguish his obligations thereunder. WFC filed a motion, grounded in the Illinois Credit Agreements Act, to strike Mr. Sevaux's affirmative defense and to dismiss Mr. Sevaux's counterclaims.

After the parties completed discovery, the district court denied WFC's motion to dismiss. *See Whirlpool Fin. Corp. v. Sevaux,* 866 F.Supp. 1097 (N.D.Ill.1994) (*"Whirlpool I "*). WFC then responded to Mr. Sevaux's affirmative defenses and counterclaims by denying that it had made any agreement with Mr. Sevaux other than the note. WFC moved for summary judgment on the affirmative defenses and counterclaims and, on December 28, 1994, the district court granted WFC's motion. *See Whirlpool Fin. Corp. v. Sevaux,* 874 F.Supp. 181 (N.D.Ill.1994) (*"Whirlpool II "*). The district court held that Mr. Sevaux's affirmative defenses and counterclaims are barred by the Illinois Credit Agreements Act.

WFC then filed a motion for judgment on the pleadings. Mr. Sevaux responded with a cross-motion for reconsideration of the summary judgment motion, in which he asserted that the case ought to be governed instead by Venezuelan law. The district court granted WFC's motion for judgment on the pleadings, denied Mr. Sevaux's cross-motion to reconsider, and ordered WFC to prove up the sums due under the note. *See Whirlpool Fin. Corp. v. Sevaux,* No. 93 C 4275, 1995 WL 153313 (N.D.Ill. Apr. 5, 1995) (*"Whirlpool III "*). Mr. Sevaux responded to WFC's motion to award damages with a cross-motion asserting that the note violates the Illinois Interest Act, 815 ILCS 205/0.01 *et seq.* The motions were assigned to a magistrate judge for a report and recommendation. Addressing Mr. Sevaux's cross-motion, the magistrate judge took the view that the note falls within the "business loan" exception to the Interest Act. *See* 815 ILCS 205/4(1)(c). Accordingly, the magistrate judge recommended that the district court deny Mr. Sevaux's cross-motion and award WFC the $1 million principal, interest, and most of its attorneys' fees and costs, but that the court deny WFC late charges under the note. The district court overruled Mr. Sevaux's objections to the report and recommendation and entered judgment in favor of WFC in the amount of $1,542,183.71.

## II

## ISSUES

Mr. Sevaux raises four issues on appeal: (1) whether the district court erred in applying Illinois law, rather than Venezuelan law, to the parties' agreements; (2) whether the district court erred in concluding, as a matter of law, that the parties' oral agreements are subject to the Illinois Credit Agreements Act; (3) whether the district court erred in concluding that the Illinois Credit Agreements Act precludes the maintenance of Mr. Sevaux's counterclaims and defenses; and (4) whether the district court erred in concluding that WFC's loan to Mr. Sevaux is exempt from the prohibition against usury as a "business loan" under 815 ILCS 205/4(1)(c).

## III

## DISCUSSION

### 1.

Mr. Sevaux first contends that the district court erred in applying Illinois law to

the parties' agreements. Instead, he submits, the district court should have applied the "most significant contacts" test and evaluated his affirmative defenses and counterclaims under Venezuelan law. In support of this position, Mr. Sevaux emphasizes that WFC negotiated and concluded the agreement to invest in Raymond in Venezuela. Moreover, he asserts, the subject matter of the contract—Raymond—is incorporated and domiciled in Venezuela and conducts its business there. Mr. Sevaux introduced an affidavit from Dr. Alfredo A. Azpurua, an expert in Venezuelan law, to prove that, under Venezuelan law, the oral agreements giving rise to his affirmative defenses and counterclaims are not required to be embodied in a writing signed by both parties.

■ We agree with the district court, however, that Mr. Sevaux waived any objection to the application of Illinois law by failing to address the choice-of-law issue earlier in the proceedings. *See Whirlpool III*, 1995 WL 153313, at *3. Under the Federal Rules of Civil Procedure, Mr. Sevaux had the obligation to provide the district court with "reasonable notice" of his intention to raise an issue of foreign law. Fed.R.Civ.P. 44.1. Our review of the record in this case establishes that, although Mr. Sevaux set out his affirmative defenses and counterclaims in his answer and amended answer,[3] he made no effort to argue from Venezuelan law until after summary judgment had been rendered against him. The district court clearly had relied on Illinois law in evaluating WFC's motion to dismiss, but Mr. Sevaux did not assert the applicability of Venezuelan law until his "Cross–Motion for Reconsideration and Reargument" of the district court's entry of summary judgment. Nor did Mr. Sevaux submit the affidavit of Dr. Azpurua, his witness with respect to Venezuelan law, until that time. The district court was not obliged to consider this belatedly submitted affidavit. *Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir.1995). On the record before us, therefore, we must conclude that the issue has been waived. *Id.* (holding that plaintiffs, who had failed to introduce affidavit of Ger-

man law until after the suit had been dismissed, waived its application); *see ECHO, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 707 (7th Cir.1995) (noting that, "[w]here neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law."); *Muslin v. Frelinghuysen Livestock Managers, Inc.*, 777 F.2d 1230, 1231 n. 1 (7th Cir.1985) (noting that acquiescence to court's choice of law amounts to waiver of any objection to such choice).

■ On appeal, Mr. Sevaux renews his contention that he did in fact challenge the application of Illinois law earlier in the proceedings. In support of this position, he invites our attention to three footnotes in memoranda submitted to the district court opposing WFC's motion to dismiss. We agree with the district court, however, that these footnotes merely address the applicability of the Illinois Commercial Code—and not the applicability of Illinois law in general. Contrary to Mr. Sevaux's suggestion, these references were not sufficient to put WFC and the district court on notice that he believed that Venezuelan law should apply. For instance, in his brief opposing WFC's motion to dismiss, Mr. Sevaux asserted only that, under the "significant relationship" test, "there is a serious question whether the Illinois Statute of Frauds would even apply to [his] contract claim." R. 28, at 8 n. 2. These references gave no affirmative indication that he believed that Venezuelan law ought to apply. Notably, Mr. Sevaux did not file the affidavit of Alfredo Azpurua, his witness to prove the content of Venezuelan law, until his "Cross–Motion for Reconsideration and Reargument" of the district court's entry of summary judgment. Under these circumstances, we must conclude that Mr. Sevaux has waived reliance on Venezuelan law. *See Frietsch*, 56 F.3d at 828.

Finally, it cannot go unnoticed that the note recites that the rights and liabilities of the parties are to be governed by the law of Illinois.[4] This recitation is potent evidence

---

3. Significantly, two of Mr. Sevaux's affirmative defenses are based on Illinois law.

4. The note provides that "[t]he validity, meaning, enforceability and effect of this Note, and the

that, even with respect to the counterclaims raised by Mr. Sevaux, the parties believed that their relationship was governed by the laws of Illinois and not another jurisdiction.

### 2.

Mr. Sevaux next asserts that the district court erred in concluding, as a matter of law, that the parties' agreements were subject to the Illinois Credit Agreements Act. Section 2 of the Credit Agreements Act imposes special writing requirements on claims stemming from a "credit agreement." 815 ILCS 160/2.[5] The Act defines a "credit agreement" as "an agreement or commitment by a creditor to lend money or extend credit or delay or forebear repayment of money...." 815 ILCS 160/1(1).

In his appeal to this court, Mr. Sevaux seeks review of defenses and counterclaims that he characterizes as predicated on two oral promises: (a) a promise by WFC to invest $17.5 million in Raymond; and (b) a promise that WFC's $17.5 million investment would extinguish Mr. Sevaux's liability under the note. Accepting for the moment Mr. Sevaux's characterization, we shall examine in turn each of these promises and determine whether the Illinois Credit Agreements Act governs these two promises, as Mr. Sevaux submits them.

### a.

█ In his original "Answer and Counterclaims" filing, Mr. Sevaux alleged that WFC's $17.5 million investment in Raymond was to be evidenced, at least in part, by "debentures." R. 11, at para. 23. When

WFC took the position that the alleged agreement to invest amounts to an "agreement ... to lend money or extend credit," within the meaning of the Credit Agreements Act, Mr. Sevaux amended his answer and counterclaims to delete any reference to debentures.[6] Evaluating WFC's motion for summary judgment, however, the district court found nothing in Mr. Sevaux's deposition testimony to support his allegation that the *entire* $17.5 million investment would be in the form of equity. Rather, the court concluded, "[Mr.] Sevaux's own testimony supports the contention that at least part of the package included debt financing, and therefore was a 'credit agreement' covered by the Act." *Whirlpool II*, 874 F.Supp. at 186. On appeal, the parties do not appear to dispute the proposition that, if any part of the proposed $17.5 million package would have taken the form of a loan, the Credit Agreements Act would apply. According to Mr. Sevaux, however, factual issues exist that ought to have prevented the district court from ruling, as a matter of law, that the parties' agreements are subject to the Act. Specifically, Mr. Sevaux challenges the district court's reading of his deposition testimony concerning the parties' negotiations.

During his deposition, Mr. Sevaux described the meetings that he had with WFC representatives in Venezuela in November 1991. Mr. Sevaux testified that, although he originally had intended to secure a $4.5 million loan from WFC, Palmieri had suggested a complete refinancing of the company. According to Mr. Sevaux, the parties discussed a two-step investment by WFC in which WFC would make a $4.5 million loan to

---

rights and liabilities of the parties, shall be determined in accordance with the laws of the State of Illinois." R. 1, Ex. A, at para. 11.

**5.** That section provides:
   **Credit agreements to be in writing.** A debtor may not maintain an action on or in any way related to a credit agreement unless the credit agreement is in writing, expresses an agreement or commitment to lend money or extend credit or delay or forbear repayment of money, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor. 815 ILCS 160/2. In *Resolution Trust Corp. v. Thompson*, 989 F.2d 942 (7th Cir.1993), we noted that

the [Credit Agreements Act] is evidently designed to impose a strong form of the Statute of Frauds—strong because, unlike the usual Statute of Frauds, it requires that the agreement itself be signed, and by both parties—on business loans made by financial institutions. *Id.* at 944 (citations omitted).

**6.** The district court denied WFC's motion to dismiss on this ground. In doing so, however, the court specifically reserved judgment on the question of whether, if discovery revealed facts indicating that credit was involved in the financing package, the Act would preclude Mr. Sevaux's counterclaims and defenses. *See Whirlpool I*, 866 F.Supp. at 1100 n. 2.

Raymond and then refinance Raymond's $13 million Venezuelan debt.[7] It was at that point, Mr. Sevaux testified, that Palmieri took him aside and told him that, "for the package of $17.5 million, I want fifty percent of the company." R. 167, Ex. A, Deposition of Jean Sevaux, at 162. Mr. Sevaux testified that "nothing was decided" about the form that WFC's investment would take; the precise vehicle for the investment was left open for determination by WFC's lawyers and tax advisors. He did state, however, that the preferable treatment accorded to equity investments by Venezuelan tax law was "a great element in the decision of the mix of the package." *Id.* at 162.

Reading Mr. Sevaux's submissions to the district court in their entirety, we agree that the promise alleged by Mr. Sevaux is subject to the Credit Agreements Act. The record simply will not support the inference that no portion of WFC's $17.5 million investment in Raymond would take the form of a loan. At one point in his deposition, Mr. Sevaux testified that the parties discussed a loan to Raymond of $4.5 million. Elsewhere, he testified that the parties discussed a second scenario in which WFC would make a $4.5 million loan to Raymond in conjunction with an additional infusion of $13 million in a yet-to-be-determined form. Even though it appears that the parties discussed a number of different investment scenarios and that no final decision was made, Mr. Sevaux's description of the parties' negotiations is certain in one important respect: Under each of the investment scenarios discussed by the parties, at least some portion of the $17.5 million was to take the form of debt rather than equity. In his deposition testimony, Mr. Sevaux refers to "the mix of the package," *id.*, and indicates that no agreement had been reached on "how the packages would be distributed between straight debt, equity [and] quasi equity," *id.* at 163.

In support of his position that the entire agreed-upon investment would take the form of a purchase of preferred stock, Mr. Sevaux places heavy reliance on an internal WFC memo indicating that WFC had "[c]ommitted to take preferred stock in [Venezuelan] company." R. 166, Ex. E. It is difficult to infer from this limited statement, however, that the proposed investment would consist entirely of preferred stock; the memo does not give any indication of the quantity of preferred stock to which WFC had committed. Indeed, the memo does little more than confirm Mr. Sevaux's deposition testimony that some of the package would consist of preferred stock in order to take advantage of Venezuelan tax laws.

Mr. Sevaux also relies heavily on Palmieri's statement that, "for the package of $17.5 million, I want fifty percent of the company." R. 167, Ex. A, Deposition of Jean Sevaux, at 162. Again, however, this statement does not exclude the possibility that debt also would be part of the financing package. Indeed, it seems likely that some amount of debt would be included in the package; Mr. Sevaux acknowledged that $17.5 million exceeded the purchase price of a fifty-percent interest in Raymond. *See id.* at 487. In short, there is nothing in Mr. Sevaux's deposition testimony to suggest that the entire $17.5 million investment would take the form of a purchase of a fifty-percent equity interest in Raymond. On the record before us, therefore, the district court was justified in concluding, as a matter of law, that the oral promise to invest alleged by Mr. Sevaux is a "credit agreement" covered by the Illinois Credit Agreements Act.

### b.

We turn to the second oral promise alleged by Mr. Sevaux—WFC's representation that he never would have to repay the note and that the $17.5 million investment would extinguish his obligations under the note. Mr. Sevaux asserts that WFC promised to convert the $1 million debt into an equity position. The district court took the view that the promise alleged by Mr. Sevaux

---

7. Mr. Sevaux summarized Palmieri's proposal as follows:
   We're going to replace, first we are going to lend you $4.5 million for the needs which I've just described and then, for your long term, for your long term debt, we are going to replace your Venezuelan borrowings by a $13 million financing made by us.
   R. 167, Ex. A, Deposition of Jean Sevaux, at 161.

amounts to a "new credit agreement" within the meaning of 815 ILCS 160/3(3)—one that would replace the $1 million note financing with equity and supply the remaining $16.5 million in promised funds. *See* W*hirlpool II*, 874 F.Supp. at 187–88. Accordingly, the court concluded, this promise also is subject to the Illinois Credit Agreements Act.

Section 3 of the Illinois Credit Agreements Act provides:

> **Actions not considered Agreements.** The following actions do not give rise to a claim, counterclaim, or defense by a debtor that a new credit agreement is created, unless the agreement satisfies the [writing] requirements of [815 ILCS 160/2]:
>
>     \*     \*     \*     \*     \*     \*
>
> (3) the agreement by a creditor to modify or amend an existing credit agreement or to otherwise take certain actions, such as entering into a new credit agreement, forbearing from exercising remedies in connection with an existing credit agreement, or rescheduling or extending installments due under an existing credit agreement.

815 ILCS 160/3. The first step in applying this section is to identify the "new credit agreement" that is alleged to have been created or the "existing credit agreement" that is alleged to have been amended or modified. Mr. Sevaux alleges that "WFC agreed to . . . apply $1 million from the $17 million purchase package for Raymond to extinguish any liability on the Note . . . on the part of [Mr.] Sevaux." R. 21, Amended Affirmative Defenses and Counterclaims, at para. 23.

As the district court correctly noted, WFC's alleged oral promise not to demand payment from Mr. Sevaux cannot easily be viewed as an agreement to amend or modify the "credit agreement" embodied in the note because WFC allegedly made the promise before Mr. Sevaux executed the note. *See* W*hirlpool I*, 866 F.Supp. at 1100; W*hirlpool II*, 874 F.Supp. at 187. Reading the allegations in Mr. Sevaux's "Amended Counterclaims and Affirmative Defenses" in their entirety, however, it is clear that, at the time that this promise was made, WFC allegedly had a pre-existing obligation, dating from the November 1991 meeting in Venezuela, to invest $17.5 million in Raymond. Given our earlier conclusion that WFC's alleged promise to invest $17.5 million in Raymond amounts to a "credit agreement" within the meaning of the Illinois Credit Agreements Act, it also is clear that this same promise amounts to an "existing credit agreement" within the meaning of 815 ILCS 160/3. Therefore, the later agreement alleged by Mr. Sevaux—to apply a portion of the investment package to extinguish Mr. Sevaux's liability on the note—amounts to a modification of WFC's pre-existing obligation. Whether this second promise alleged by Mr. Sevaux is characterized as a modification of an "existing credit agreement" or, as the district court viewed it, a "new credit agreement," it falls within section 3 of the Illinois Credit Agreements Act. With respect to this oral promise as well, therefore, the Illinois Credit Agreements Act applies to the agreement alleged by Mr. Sevaux.

#### c.

At the outset of our discussion, we noted that we accepted, for the sake of argument, the characterization of the transactions tendered by Mr. Sevaux. In the foregoing paragraphs, we have demonstrated that, even when the transaction is so characterized, the Illinois Credit Agreements Act bars recovery. Before proceeding to the next issue, however, we pause to note that other characterizations of the financial transaction are possible and perhaps more realistic. These perspectives, however, are also unavailing to Mr. Sevaux. For instance, it is quite possible to view the matter in question as a single agreement for the assumption of a $17.5 million responsibility by WFC in Raymond that involved, as part of the agreement, an oral understanding that Mr. Sevaux would incur no personal responsibility on his guarantee of the initial million dollar payment by WFC because of the substantially contemporaneous oral understanding to that effect. Such an arrangement would amount to a credit agreement whose essential terms were not committed to writing and would run afoul of section 2 of the Act. Similarly, if we focus on the microcosm of the execution of the note by Mr. Sevaux, one can characterize the alleged oral agreement that he not be person-

ally liable as an oral side agreement to a credit agreement that would also run afoul of section 2 of the Act. Either of these two scenarios appear to be at least as realistic an appraisal of the practicalities of the situation facing the parties. Each is equally unavailing to Mr. Sevaux.

### 3.

Mr. Sevaux next submits that, even if the Illinois Credit Agreements Act does apply, the district court erred in concluding that the Act forecloses his counterclaims and affirmative defenses. In support of this position, he raises two related arguments. He first asserts that section 2 of the Credit Agreements Act, which prohibits only "actions" maintained on an oral credit agreement, has no application to his counterclaims and affirmative defenses. He further contends that the district court erred in finding that the traditional common law exceptions to the Statute of Frauds, including part performance, fraud and estoppel, are unavailable to him under the Credit Agreements Act. We shall address each of these contentions in turn.

■ We first address the impact of the Illinois Credit Agreements Act on Mr. Sevaux's counterclaims. Section 2 of the Credit Agreements Act provides that "a debtor may not maintain an action on or in any way related to a credit agreement unless the credit agreement is in writing ... and is signed by the creditor and the debtor." 815 ILCS 160/2. The Illinois courts have interpreted this provision to proscribe "[a]ll actions which depend for their existence upon an oral credit agreement." *Klem v. First Nat'l Bank of Chicago*, 275 Ill.App.3d 64, 211 Ill.Dec. 828, 830, 655 N.E.2d 1211, 1213 (1995) (quoting *First Nat'l Bank in Staunton v. McBride Chevrolet, Inc.*, 267 Ill.App.3d 367, 204 Ill.Dec. 676, 680, 642 N.E.2d 138, 142 (1994), *appeal denied*, 159 Ill.2d 566, 207 Ill.Dec. 515, 647 N.E.2d 1008 (1995)). Indeed, "there is no limitation as to the type of actions by a debtor which are barred by the Act, so long as the action is in any way related to a credit agreement." *First Nat'l Bank in Staunton*, 204 Ill.Dec. at 680, 642 N.E.2d at 142. Under this interpretation, all claims "on or in any way related to" an oral

credit agreement—whether sounding in contract or in tort—are barred by the Act. *See Klem*, 211 Ill.Dec. at 829, 655 N.E.2d at 1212; *see, e.g., General Elec. Capital Corp. v. Donogh Homes, Inc.*, No. 93 C 5614, 1993 WL 524814, at *3–4 (N.D.Ill. Dec. 15, 1993) (dismissing, in addition to counterclaims grounded in "promissory estoppel" and "breach of contract," counterclaims of negligent and intentional misrepresentation).

■ Mr. Sevaux asserts five counterclaims against WFC: (1) fraud; (2) breach of contract; (3) promissory estoppel; (4) breach of fiduciary duty; and (5) constructive fraud. Each of these counterclaims alleges, in essence, that WFC falsely represented an intent to invest $17.5 million in Raymond and that, in reliance on that promise, Mr. Sevaux executed the note and invested an additional $1 million of his own money in Raymond. Because each of Mr. Sevaux's counterclaims thus "depend[s] for [its] existence" upon this oral credit agreement, they are barred by the Credit Agreements Act. *First Nat'l Bank in Staunton*, 204 Ill.Dec. at 680, 642 N.E.2d at 142. Mr. Sevaux's final assertion on this point—that his counterclaims are not "actions" within the meaning of 815 ILCS 160/2—is wholly without merit.

■ We turn to Mr. Sevaux's defenses. As set out more fully above, section 3 of the Illinois Credit Agreements Act provides that certain actions taken by a creditor "do not give rise to a claim, counterclaim, or defense by a debtor that a new credit agreement is created," unless the writing requirement is satisfied. 815 ILCS 160/3. Among these are:

the agreement by a creditor to modify or amend an existing credit agreement or to otherwise take certain actions, such as entering into a new credit agreement, forbearing from exercising remedies in connection with an existing credit agreement, or rescheduling or extending installments due under an existing credit agreement.

815 ILCS 160/3(3). Mr. Sevaux pleaded six affirmative defenses: (1) fraud in the inducement; (2) fraud under 815 ILCS 105/10; (3) estoppel by breach of fiduciary duty; (4) constructive fraud; (5) failure of consider-

ation; and (6) want of consideration under 815 ILCS 105/9. All of these affirmative defenses arise out of WFC's alleged oral promises to lend some or all of the $17.5 million to Raymond and then to extinguish Mr. Sevaux's debt obligation. Because the Credit Agreements Act prohibits a debtor from defending on the basis of an oral promise to "enter into a new credit agreement," 815 ILCS 160/3(3), the Act precludes all of Mr. Sevaux's affirmative defenses. *See First Nat'l Bank in Staunton*, 204 Ill.Dec. at 678, 681, 642 N.E.2d at 140, 143 (affirming, without citation to a specific provision of the Act, the dismissal of defenses based on an oral credit agreement); *Resolution Trust Corp. v. Thompson*, 989 F.2d 942, 943–44 (7th Cir. 1993) (holding that the Act bars a debtor from defending on the ground that the lender orally had agreed to forgive a loan); *Donogh Homes*, 1993 WL 524814, at *5 (finding affirmative defenses that are "related to" an oral credit agreement barred by 815 ILCS 160/2).

██ The Illinois courts have considered—and rejected—Mr. Sevaux's assertion that the Illinois legislature did not intend to foreclose the traditional common law exceptions to the Statute of Frauds. As one division of the Appellate Court of Illinois recently stated,

> [t]he broad language of the Act bars—without express exception—actions "on or in any way related to" unwritten credit agreements. That Illinois had long recognized common-law exceptions to the application of the Frauds Act only highlights the legislature's failure to recognize those exceptions in the language of the Act itself. We cannot properly read such exceptions into the Act, as its language is clear and unambiguous.

*Klem*, 211 Ill.Dec. at 830, 655 N.E.2d at 1213 (citations omitted); *accord McAloon v. Northwest Bancorp, Inc.*, 274 Ill.App.3d 758, 211 Ill.Dec. 281, 285, 654 N.E.2d 1091, 1095 (1995) ("Given the broad language of the Act and our conclusion that the [Credit Agreements] Act is intended to extend beyond the Frauds Act, we conclude that the Act bars traditional exceptions to the application of the Frauds Act, such as equitable estoppel."). As these passages make clear, the Illinois courts have given effect to the broad language of the Credit Agreements Act; the traditional exceptions to the Illinois Frauds Act—including part performance, estoppel and claims sounding in tort—may not be raised to counter an action that falls within the scope of the Credit Agreements Act. *See, e.g., Klem*, 211 Ill.Dec. at 829–30, 655 N.E.2d at 1212–13 (barring misrepresentation and promissory estoppel claims); *McAloon*, 211 Ill.Dec. at 284–86, 654 N.E.2d at 1094–96 (holding that breach of contract, fraud and equitable estoppel claims are barred by the Act); *First Nat'l Bank in Staunton*, 204 Ill.Dec. at 678–80, 642 N.E.2d at 140–42 (barring counterclaims for tortious interference with a business relationship, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, fraud, estoppel and wrongful dishonor of a check); *Donogh Homes*, 1993 WL 524814, at *3–6 (holding that counterclaims for promissory estoppel, breach of good faith and fair dealing, negligent misrepresentation, intentional misrepresentation, violation of Illinois Deceptive Trade Practices Act and intentional interference with prospective business advantage are barred by the Act). Accordingly, the district court correctly concluded that each of Mr. Sevaux's counterclaims and affirmative defenses is barred by the Illinois Credit Agreements Act.

### 4.

Mr. Sevaux's final claim is that the district court erred in failing to enforce his defense of usury. Paragraph 1.1 of the note provides that unpaid principal, or principal balance, shall bear interest at the fluctuating rate of two percent above the prime rate. The "late charge" provision, paragraph 2.6 of the note, states: "If any payment due hereunder is received by the holder of this Note more than five days after its due date, [Mr. Sevaux] shall pay a late charge equal to five percent of the amount then due." R. 1, Ex. A, at para. 2.6. Mr. Sevaux submits that, because WFC claims a right to collect at least seven percent interest on money that is past due—two points higher than the legal rate, *see* 815 ILCS 205/2—the note is usurious under the Illinois Interest Act, 815 ILCS 205/0.01 *et seq.*

In his report and recommendation, the magistrate judge took the view that WFC is not entitled to the "late charge" because the five percent assessment amounts to a penalty provision, rather than a provision for liquidated damages. Nevertheless, addressing Mr. Sevaux's claim of usury, the magistrate judge concluded that 815 ILCS 205/4(1)(c), the so-called "business loan" exception to the Interest Act, bars Mr. Sevaux's claim of usury.[8] The district court adopted the magistrate judge's report and recommendation. The court noted that, in addition, it found "persuasive" WFC's position that Mr. Sevaux has waived his usury claim. R. 212, at 1 n. 1.

The Illinois Interest Act exempts from its usury provision:

> any business loan to a business association or copartnership or to a person owning or operating a business as sole proprietor or to any persons owning and operating a business and joint venturers, joint tenants or tenants in common, or to any limited partnership, or to a trustee owning and operating a business or whose beneficiaries own and operate a business. . . .

815 ILCS 205/4(1)(c). Mr. Sevaux submits that, as an individual borrower, he does not fit within any of the enumerated exceptions to the usury provision. Nor, he contends, are Raymond's interests identical to his own such that he and Raymond were, in effect, one and the same corporate borrower.

▆▆ We turn first to the issue of waiver. WFC asserts that, because Mr. Sevaux raised his claim of usury for the first time in his cross-motion to WFC's motion to award damages, he has waived reliance on the defense. Mr. Sevaux responds, however, by asserting that he was not apprised of the relevant facts until WFC claimed, in its motion for judgment on the pleadings, entitlement to both the simple interest and the late charge.[9]

Our review of the relevant pleadings establishes, however, that Mr. Sevaux was sufficiently put on notice of the possibility of a usury defense. WFC's complaint clearly alleges that payment of the note is overdue and unambiguously seeks recovery according to the note's terms. From these allegations, Mr. Sevaux clearly was put on notice that WFC sought recovery of both the five percent late charge as well as the simple interest of two percent over prime. The interest provisions in the note, including the five percent "late charge," are clearly set forth. Mr. Sevaux had numerous opportunities to plead usury prior to the entry of judgment on the pleadings for sums due under the note, yet he failed to do so until his cross-motion responding to WFC's motion to award damages. Under these circumstances, we are unable to conclude that Mr. Sevaux raised the defense of usury in a timely manner.

▆▆ We also agree with the district court that Mr. Sevaux's claim of usury falls within the "business loan" exception to the Interest Act. *See* 815 ILCS 205/4(1)(c). The Illinois courts have taken a fairly pragmatic approach to determining whether a particular loan falls within one of the categories of "business loans" enumerated in subsection 4(1)(c). As the Illinois Supreme Court succinctly stated in *People v. Gallo*, 54 Ill.2d 343, 297 N.E.2d 569 (1973), "[t]he line here is drawn between loans to those who are engaged in business and loans to those who are not." *Id.* at 351, 297 N.E.2d 569; *see also*

8. The magistrate judge and the district court assumed, without deciding, that Mr. Sevaux's usury defense survives the determination that the five percent late charge is unenforceable as a penalty. Because we agree with the district court that the obligation embodied in the note falls within the "business loan" exception to the Interest Act, we express no opinion on the question.

9. The Interest Act requires a party intending to rely upon a usury defense or claim to provide adequate notice to the court and to the opposing party. Section 7 of the Interest Act provides:

> **Necessity of pleading usury—Notice of intention to set up defense.** The defense of usury shall not be allowed in any suit, unless the person relying upon such defense shall set up the same by plea, or filed in the cause a notice in writing, stating that he intends to defend against the contract suit upon or set off, on the ground that the contract is usurious.

815 ILCS 205/7. The parties make no contention that this section is inapplicable in federal court. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). We have no reason to believe that a federal court would be any more tolerant of a delay in pleading the defense. *See* Fed.R.Civ.P. 12(b).

*Chicago Title & Trust Co. v. Jensen,* 271 Ill.App. 419, 422 (1933) ("The question whether a loan in usurious is a question of fact, and in determining that question equity will look to the substance of the transaction and disregard the form...."). The Appellate Court of Illinois applied this pragmatic approach in *Ehlers v. Frey,* 109 Ill.App.3d 1004, 65 Ill.Dec. 516, 441 N.E.2d 651 (1982) and *Rock River Savings & Loan Assoc. v. Kelly,* 58 Ill.App.3d 339, 16 Ill.Dec. 366, 374 N.E.2d 1141 (1978) to loans that had been made jointly to an individual and a corporation. In each case, the court took the view that 815 ILCS 205/4(1)(c) excludes from the Interest Act's requirements business loans that are made to corporate shareholders and used to finance corporate business activities. In reaching this conclusion, the *Ehlers* and *Rock River Savings & Loan* courts found significant the fact that proceeds of the loan were in fact used for business purposes. The Illinois courts also considered the fact that the individual borrowers had directed the proceeds of the loan to be paid to the corporation and the fact that the loans had been obtained in anticipation of future financial gain by the corporation, inuring to the benefit of the individual borrowers. *See Ehlers,* 65 Ill.Dec. 516, 441 N.E.2d at 654–55; *Rock River Sav. & Loan,* 16 Ill.Dec. at 367–69, 374 N.E.2d at 1142–44.

Applying this pragmatic approach to the situation before us, we agree with the district court that the business loan exception to the Illinois Interest Act applies to bar Mr. Sevaux's claim of usury. The facts and circumstances surrounding the transaction demonstrate that the note evidenced, in substance, a loan to the corporation: (1) Mr. Sevaux was the President and sole owner of Raymond. (2) Paragraph 8 of the note "warrants that this Note is a result of a commercial loan transaction," R. 1, Ex. A, at para. 8. (3) The proceeds of the note were transferred to Raymond's corporate account rather than to Mr. Sevaux's personal account. (4) The proceeds were used by Raymond for business purposes. (5) Raymond made the one and only interest payment on the note. Applying the pragmatic approach of *Ehlers* and *Rock River Savings & Loan* to these facts, the district court correctly concluded that the

business loan exception applies to bar Mr. Sevaux's claim of usury.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.